# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | William J. Hibbler | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 2078 | **DATE** | 5/17/2004 |
| **CASE TITLE** | American Motorists Insurance Company v. Stewart Warner Corporation | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

AMICO motion for summary judgment, SW motion to strike AMICO's statement of undisputed facts and to deny AMICO's motion for summary judgment, SW motion to strike AMICO's LR 56.1(b)(3)(B) statement of additional facts and portions of AMICO's reply brief in support of the motion for summary judgment (doc.s ## 28, 37, 44)

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing [held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference [held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial [set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs [by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] AMICO's motion for summary judgment is GRANTED. The Court holds that AMICO is not obligated to defend and indemnify SW for expenses that SW has incurred and will continue to incur as a result of the environmental contamination at its plant on Drover Street in Indianapolis, Indiana, unless and until a complaint is filed against SW in a court of law regarding the environmental contamination. SW's motion to strike AMICO's statement of undisputed facts is DENIED. SW's motion to strike AMICO's LR 56.1(a)(3) reply to SW's statement of additional facts and portions of AMICO's reply brief in support of the motion for summary judgment is also DENIED. Enter Memorandum Opinion and Order.
(11) ☐ [For further detail see order on the reverse side of the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | MAY 18 2004 date docketed | | 48 |
| ✓ | Docketing to mail notices. | | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| | | | date mailed notice | | |
| JHC | courtroom deputy's initials | | | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

AMERICAN MOTORISTS INSURANCE )
COMPANY, )
        Plaintiff, )
 ) No. 01 C 2078
v. )
 ) The Honorable William J. Hibbler
STEWART WARNER CORPORATION )
 )
        Defendant. )

**DOCKETED MAY 1 8 2004**

## MEMORANDUM OPINION AND ORDER

### I. PROCEDURAL BACKGROUND

Plaintiff, American Motorists Insurance Company ("AMICO"), seeks summary judgment in its favor: (1) on its complaint for declaratory judgment ("Complaint") against Stewart Warner Corporation ("SW"); and (2) on all counts of SW's first amended counterclaim ("Counterclaim"). In its Complaint, AMICO seeks a declaration that AMICO owes no duty to defend and indemnify SW for expenses that SW has incurred and will continue to incur as a result of the environmental contamination at its plant on Drover Street in Indianapolis, Indiana. In its response, SW not only requests that this Court deny AMICO's motion for summary judgment, but also that this Court enter judgment in SW's favor on SW's Counterclaim, which seeks declarations of AMICO's duty to defend and indemnify SW. This request is tantamount to a request for summary judgment, which is inappropriate to raise in a response brief. Regardless, SW's Counterclaim is dismissed in full because the Court finds that AMICO's summary judgment motion should be granted.

### II. BACKGROUND

AMICO issued general and excess liability insurance coverage to SW over a period of more

than twenty-two years, from October 1, 1965, through January 1, 1988, and in July 1997, AMICO and SW entered into an agreement with respect to the relevant claims and the liability insurance policies issued to SW. AMICO is an Illinois corporation with its principal place of business in Long Grove, Illinois. SW is a Virginia corporation, with its principal place of business in Connecticut. However, at the time that AMICO issued its insurance policies to SW, SW was headquartered in Chicago, Illinois, and its principle place of business was Illinois. The AMICO policies were issued to "Stewart-Warner Corporation" as the named insured at the address "1826 Diversey Parkway, Chicago, Illinois 60614." The policies were countersigned in Chicago, Illinois. AMICO issued the policies through Alexander & Alexander, a licensed insurance broker located in Chicago, Illinois.

The AMICO policies provided coverage to SW in eight states (California, Connecticut, Illinois, Indiana, Michigan, New York, North Carolina, and Ohio) as well as the District of Columbia and Ontario, Canada. AMICO's coverage included the SW facility at 1514 Drover Street, Indianapolis, Indiana. SW has owned the Drover Street site since 1935, and SW operated a manufacturing facility there from approximately 1935 through 1989. The facility functioned to fabricate and assemble machined metal parts. In the processing of the metal parts, SW used the volatile organic compounds ("VOC") trichloroethylene and perchloroethylene.

In 1989 SW ceased operations at the site and filed closure plans with the Indiana Department of Environmental Management ("IDEM") in order to achieve a closure of the site in accordance with the Resource Conservation and Recovery Act ("RCRA"). The closure samplings revealed VOC contamination in the soil. By 1997, the facility's machinery, equipment, and chemical storage tanks were removed, and the buildings at the site were destroyed.

In a letter dated October 13, 1999, Eli Lilly & Company ("Lilly"), which owned property

adjacent to the Drover Street site, notified SW that the VOC contamination had migrated to Lilly's property and that Lilly would like the source of the contamination to be remediated and evaluated. After meeting with SW but receiving no follow-up, an attorney for Lilly sent a second letter on May 9, 2000, asserting that SW had not adequately responded to Lilly's first letter. The attorney insisted that if SW did not contact Lilly to resolve the matter, Lilly would seek an alternative method, potentially a lawsuit, to obligate SW's response.

In a letter dated October 19, 1999, the U.S. Environmental Protection Agency ("EPA") advised SW that pursuant to the RCRA, the EPA intended to conduct a visual site inspection to ensure that the site did not pose an environmental hazard to human health or the environment. This letter also counseled that corrective action might be required to address releases of hazardous wastes. After its visual inspection, the EPA sent a second letter dated January 13, 2000, notifying SW that the Drover Street site was listed as a "High Priority" facility slated for corrective action. The EPA indicated that it planned to issue a Corrective Action Order within the year, which SW could avoid by signing a Voluntary Agreement with the EPA. If a Voluntary Agreement was not reached, the EPA reported that it could potentially require corrective action through an administrative enforcement order or lawsuit.

In September 2000, SW signed a Corrective Action Agreement with the EPA by which SW agreed to perform further investigation and any necessary remediation of contamination. Upon meeting the conditions of the Agreement, the EPA was to respond in writing that SW had completed the RCRA corrective action and issue SW a "No Further Action" letter. In December 2001, however, SW unilaterally terminated the Corrective Action Agreement. In response, the EPA issued an Administrative Order for corrective action on October 15, 2002.

In the Administrative Order, the EPA advised that statutory penalties could be imposed if the terms of investigation and remediation were violated. After further negotiations between SW and the EPA, the Order was modified and became final in August 2003. In general, this Administrative Order requires SW to implement the same investigation and remediation tasks as the voluntary agreement of 2000, including the following, all to be carried out in a manner acceptable to the EPA: an RCRA Facility Investigation to detail the character and extent of soil and groundwater contamination; a Corrective Measures Study to explore and evaluate possible remedies; and the implementation, monitoring, and maintenance of the corrective measures chosen to protect human health and/or the environment.

On December 30, 1999, SW requested that AMICO defend against and indemnify SW from Lilly's claim. AMICO responded by letter on February 23, 2000, denying coverage. AMICO claimed that it did not have a duty to defend and indemnify SW because a lawsuit had not been filed against SW by Lilly, and because certain of the insurance policies gave AMICO the right, but not a contractual duty, to defend. To date, neither Lilly nor the EPA has filed suit in a court of law against SW.

## III. DISCUSSION

### A. Legal Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Summary judgment should be granted when the record as a whole shows that a rational trier of fact could not

4

find for the non-moving party. *Rogers v. City of Chi.*, 320 F.3d 748, 752 (7th Cir. 2003). In considering a motion for summary judgment, the court views all facts and draws all reasonable inferences in a light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court interprets an insurance policy as a question of law, and, thus, summary judgment is a possible disposition for such matters. *See Jupiter Aluminum Corp. v. Home Ins. Co.*, 225 F.3d 868, 873 (7th Cir. 2000).

### B. Choice of Law

The first question facing this Court is that of choice of law, as the parties dispute whether Illinois or Indiana law should apply. The insurance contracts at issue do not contain a choice of law provision. Although the location of the underlying risk at issue is Indiana, most of the other contractual contacts occurred in Illinois: AMICO is an Illinois corporation with its primary place of business in Illinois; at the time AMICO issued its policies to SW, SW was headquartered in Illinois with its primary place of business in Illinois; SW is licensed to do business in Illinois (although Connecticut is its current principle place of business); the policies were issued and countersigned in Illinois; and Illinois is the state where this lawsuit was filed. In addition, the parties contracted for insurance coverage for risks in several different states and Canada. As this Court sits in diversity jurisdiction, it will apply the conflict of laws rules of its forum state, Illinois. *Jupiter Aluminum Corp.*, 225 F.3d at 873 (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).

Illinois courts apply a "most significant contacts" test to establish the governing substantive law for an insurance contract. *Lapham-Hickey Steel Corp. v. Protection Mut. Ins. Co.*, 166 Ill. 2d 520, 655 N.E.2d 842 (1995). Under the *Lapham-Hickey* test, in the absence of an express provision for choice of law, the rights and responsibilities of the parties to an insurance contract are determined

by:

> the location of the subject matter, the place of delivery of the contract, the domicile of the insured or insurer, the place of the last act to give rise to a valid contract, the place of performance, or other place bearing a rational relationship to the general contract.

*Id.* at 526-27, 844-45. The location of the insured risk should constitute a primary factor in the choice of law determination unless the coverage includes a group of risks scattered through more than one state. *See, e.g., Soc'y of Mount Carmel v. Nat'l Ben Franklin Ins. Co. of Ill.*, 268 Ill. App. 3d 655, 665, 643 N.E.2d 1280, 1287 (1st Dist. 1994); *Diamond State Ins. Co. v. Chester-Jensen Co.*, 243 Ill. App. 3d 471, 488-89, 611 N.E.2d 1083, 1093 (1st Dist. 1993). *See also* Restatement (Second) of the Conflict of Laws § 193, comment b (1971) (the "location of the insured risk will be given greater weight than any other single contact in determining the state of the applicable law;" however, the location of the risk has less significance when the coverage includes a "group of risks that are scattered throughout two or more states.")

In the instant case, the SW policies covered risks located in several states and Canada, and they did not contain specific provisions within the contract mandating different treatment based upon the state law for particular locations.[1] AMICO issued a single insurance policy that was to apply

---

[1] SW argues that within each insurance contract, the policies applied separately to each subsidiary and/or affiliate at each location, thereby suggesting that AMICO would handle each insured location as if a separate policy covered it. However, a close reading of the policies indicates that the parties intended that each contract would have an equal application across all subsidiaries and/or affiliates. In reading the severability clauses for the 1965-1971 general liability insurance contracts as a whole, it does not appear that the parties intended that AMICO would treat the insured facilities distinctly. These severability clauses state that each subsidiary and/or affiliate would be treated "in the *same* manner and to the *same* extent as if a separate policy had been issued to each . . . ." (Emphasis added.) Furthermore, the 1972-1988 general liability policies provided that AMICO would consider the policies as being separate only in the instance that one insured would become liable for an injury to another insured. None of the excess liability policies contain a severability clause.

6

uniformly across all of SW's facilities. In *Lapham-Hickey* the Illinois Supreme Court specifically considered the circumstances of an insurance policy which covered risks located in different states. The insured sought to recover defense costs incurred in the course of investigating environmental contamination at one of its facilities. 166 Ill. 2d at 522, 655 N.E.2d at 843. The facts in *Lapham-Hickey* are similar to those in the case at hand: the insurance policy covered property in six different states, the insurance contract was delivered in Illinois, the insured was an Illinois corporation, and the insurer was licensed to do business in Illinois. *Id.* The only connection with Minnesota was that the underlying claim had arisen there. *Id.* In light of these factors, the Illinois Supreme Court found that in order to promote consistent outcomes, Illinois law, rather than the location of the underlying risk, should govern the policy interpretation. *Id.* at 527, 845.

Illinois appellate courts follow *Lapham-Hickey*, holding that where the insurance policy extends to risks located in more than one state, the significance of the location of coverage diminishes. For example, in a case in which the underlying liabilities for contamination arose in five different states, the appellate court reversed a lower court determination that the law of each state should apply to the insured risk located within its borders. *Emerson Elec. Co. v. Aetna Cas. and Sur. Co.*, 319 Ill. App. 3d 218, 230-31, 743 N.E.2d 629, 640 (1st Dist. 2001). Although the court acknowledged that the location of the insured risk is typically the most salient factor when the insurance contract covers only one state, the court placed little weight on the location of the risk because the policy covered risks in twenty states. *Id.* at 232, 640. The determinative factors in *Emerson* were the place of delivery of the insurance contract, the last act to give rise to the contract, and the domicile of the insured. *Id.* at 232-41, 641-46.

Furthermore, in *Maremont Corp. v. Cheshire*, where the insurance policies covered risks in

7

five states, the court guarded against inconsistent interpretations as advised in *Lapham-Hickey* by refusing to apply South Carolina law, the location of the contaminate site. 288 Ill. App. 3d 721, 726-27, 681 N.E.2d 548 (1st Dist. 1999). All other relevant events occurred in Illinois: the insured was an Illinois corporation, and Illinois was its place of business; two of the four insurance companies involved in the lawsuit were Illinois corporations doing business in Illinois, while the other two companies were licensed to do business in Illinois; and the policies were negotiated, purchased, and delivered in Illinois. *Id.* The court therefore applied Illinois law. *Id.*

Similarly, when the appellate court was faced with an insurance contract covering risks across twenty-four states, the court ruled that the location of the cause of action merited little weight and could not be a determinative factor in selecting the state with the most significant relationship. *Employers Ins. of Wausau v. Ehlco Liquidating Trust*, 309 Ill. App. 3d 730, 739-40, 723 N.E.2d 687, 694-95 (1st Dist. 1999). Although the underlying dispute arose in Arizona, Illinois had the most significant relationship to the contract dispute because it was the state in which the insurance was issued, the insured had its principal place of business, and the insurer was licensed to conduct business. *Id.* at 740-41, 695-96.

SW's cases attempting to demonstrate that the location of the insured risk should govern in this case are inapposite. First, unlike the instant case, the insurance policies at issue in *Diamond State*, 243 Ill. App. 3d 471, 611 N.E.2d 1083, and *Mass. Bay Ins. Co. v. Vic Koenig Leasing, Inc.*, 136 F.3d 1116, 1122-23 (7th Cir. 1998), only covered the insured risk in a single state. Second, in *Mass. Bay*, Tennessee represented both the location of the insured risk and the state in which the underlying lawsuit was filed. 136 F.3d at 1122-23. Likewise, in *W. Am. Ins. Co. v. Moonlight Design, Inc.*, the court chose to apply New York law because not only was it the state in which the

8

underlying injury occurred, but it was also the state where the lawsuit was filed, and both the insured and the party suing the insured were corporations operating out of New York. 95 F. Supp. 2d 838, 840-42 (N.D. Ill. 2000). Finally, unlike in the SW policy, the insurance policies at issue in *Mount Carmel*, 268 Ill. App. 3d at 664-65, and *KNS Co.s v. Federal Ins. Co.*, 866 F. Supp. 1121, 1125 (N.D. Ill. 1994), covered multiple risks as separate policies, each insuring a separate risk. Under the Restatement (Second) of Conflict of Laws §193, comment f, such multiple risk policies will typically delineate different requirements for risks in various locations based upon, for example, "special statutory forms of the several states involved."

In keeping with *Lapham-Hickey* and its progeny, Illinois law should be used to interpret the AMICO policies. Indiana is only the site of the contamination. At the time that the insurance policies were issued, Illinois was the principal place of business and headquarters for SW. Illinois is AMICO's principle place of business and state of incorporation. The insurance policies at issue were delivered to SW at an address in Chicago, Illinois, where they were also countersigned. The location of the subject matter covered by the AMICO policies extends across nine states and Canada. Therefore, in keeping with *Lapham-Hickey*'s goal of avoiding inconsistent interpretations of insurance policies covering risks across several states, the Court will apply Illinois law.

C.     **Duty to Defend and Indemnify**

AMICO argues that it need not defend or indemnify SW with regard to the expenses related to the investigation and remediation of the contamination at the Drover Street facility. AMICO claims that the language of the general liability policies it issued to SW unambiguously states that the parties contracted for defense of only "suits," and there has not been a suit filed against SW. Every general liability insurance contract issued by AMICO to SW between 1965 and 1988 contains

9

the following language pertaining to coverage:

> To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages . . . because of . . . bodily injury or property damage . . . to which this policy applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured alleging such injury or property damage and seeking damages which are payable under the terms of this policy. . . .

AMICO claims that this language only raises a duty to defend when a lawsuit is filed against the insured. In addition, the excess policy of 1975-1976 contains a drop-down provision with respect to "any occurrence not covered by . . . the underlying policy(ies)" to "defend any suit seeking damages because of personal injury, property damage, or advertising liability. . . ." With regard to the other policies AMICO issued to SW, AMICO asserts that they do not contain a contractual promise to defend at all. The AMICO excess polices of 1965-1974 do not contain duty to defend provisions.

When determining whether an insurance contract specifies a duty to defend, the court must evaluate the implications in the underlying complaint and balance these with the relevant coverage provisions. *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill. 2d 90, 107-08, 607 N.E.2d 1204, 1212 (1992). As previously stated, the construction of an insurance policy is a question of law. *Id.* at 108, 1212. A court must construe the policy with concern for the intent of the parties upon contracting. *Id.* To establish the meaning of the policy's language and the parties' intent, the court looks to the policy as a whole "with due regard to the risk undertaken, the subject matter that is insured and the purposes of the entire contract." *Id.* Where the words of the policy are unambiguous, the court gives them their "plain, ordinary, and popular meaning." *Id.* Language that has more than one interpretation is ambiguous, and must be interpreted in favor of the insured. *Id.*

### 1. Duty to defend against "suits"

AMICO argues that it need not defend or indemnify SW with regard to the expenses associated with responding to the demands of the EPA and Lilly because the language of the general liability policies is unambiguous that the parties contracted for defense of only "suits,"[2] and there has not been a suit filed against SW. SW responds that AMICO's duty to defend arose when the EPA first threatened to order, and then ordered, SW to engage in cleanup work based upon statutory authority requiring corrective action when contamination by hazardous waste has occurred.

The Illinois Supreme Court in *Lapham-Hickey* addressed the issue of when a "suit" exists in the environmental context. *Lapham-Hickey*, 166 Ill. 2d at 530, 655 N.E.2d at 846-47. Although the term, "suit," was used in the insurance policy, the insured argued that the state environmental agency's consent order had triggered the insurer's duty to defend and indemnify the insured for the costs of the investigation of its environmental contamination. *Id.* at 525, 844. The policy at issue in *Lapham Hickey* stated that the insurer:

> ... agrees to defend any suit against the Insured alleging liability for such damage, destruction or loss and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but this company may without prejudice, make such an investigation, negotiation and settlement of any claim or suit as the Company deems expedient.

*Id.* at 528, 845-46.

As the issue of the definition of "suit" in the environmental context was one of first impression, the *Lapham-Hickey* court reviewed previous opinions of other federal and state courts

---

[2]The policies at issue define "suit" as including, in addition to lawsuits, "an arbitration proceeding to which the insured is required to submit or to which the insured has submitted with the company's consent. The company shall be entitled to exercise all the insured rights in the choice of arbitrators and in the conduct of arbitration proceedings." There is no arbitration proceeding at issue in this case.

11

interpreting the meaning of "suit" in the context of a comprehensive general liability policy. *Id.* at 528, 530; 844, 846. The court examined approaches in which courts interpret "suit" liberally in favor of the insured, bearing in mind the coerciveness of potentially responsible person ("PRP") letters and the gravity of the government's effort. *Id.* at 530-31, 847. However, the Illinois Supreme Court rejected these analyses and instead adopted the analysis of courts interpreting "suit" in the context of environmental insurance claims as an unambiguous word requiring "the commencement of some action in a court of law before an insurer's duty to defend is triggered." *Id.* at 531, 847.

In applying this rule, the Illinois Supreme Court held that a suit was not initiated upon the insured by any of the following actions: an initial letter from the EPA indicating that the insured's facility was a candidate for the "National Priorities List" under CERCLA; a draft consent order labeling the insured a responsible party who was strictly liable for contamination at its facility; and the "no-action" letter negotiated by the insured and the Minnesota Pollution Control Agency which approved the insured's cleanup plan. *Id.* at 524, 533; 844, 847-48. The environmental protection agencies did not file any complaints in a court of law and none of the documents that they produced to the insured accomplished service of process upon it. *Id.* at 533, 847-48. The court acknowledged that although the tone of the documents may have been confrontational, the documents alone were not complaints and did not compel a duty to defend. *Id.*

After *Lapham-Hickey*, the Illinois appellate court considered whether a duty to defend existed under an insurance policy with a provision "to defend any suit alleging such injury or damage." *Fruit of the Loom, Inc. v Travelers Indemnity Co.*, 284 Ill. App. 3d 485, 495, 672 N.E.2d 278, 285-86 (1st Dist. 1996). The insured company sought a judicial declaration that the insurer had breached its duty to defend the company in association with the environmental contamination at one of its

manufacturing plants. *Id.* at 492-93, 283-84. The federal and state environmental protection agencies had issued an abatement order to the company demanding that it investigate and establish or modify procedures to avoid contamination of the waters and soil. *Id.* at 489, 281-82. Ten years later the company sold its plant and, pursuant to state law, certified to the federal and state protection agencies that it would remain responsible for the cost of remedial action and would remove hazardous waste in accordance with the agencies' approval. *Id.* at 490, 282.

After discovering other contaminants on the property in an inspection associated with the sale, the state agency sent the company an enforcement action letter. *Id.* at 490-91, 495; 282-83, 285-86. The state's letter characterized itself as a notice with the purpose of formally requiring affirmation that the contamination was removed in accordance with state and federal regulations. *Id.* at 495, 285-86. The state required that the company certify in writing the specific remedial actions to be taken. *Id.* The court held that this letter "did not initiate a suit, was not filed in a court of law and did not accomplish service of process" upon the company. *Id.* Because the state's letter did not initiate a suit, the insurers' duty to defend was not implicated. *Id.*

Similarly, in *Zurich Ins. Co. v Carus Corp.*, the insured company sought a declaratory judgment that under its general liability policies, the insurance companies were liable for expenses it incurred investigating potential environmental pollution. 293 Ill. App. 3d 906, 906, 689 N.E.2d 130, 131 (1st Dist 1997). The insurance policies provided that "the company shall have the right and duty to defend any suits against the insured seeking damages." *Id.* at 909, 133. The court applied *Lapham-Hickey* and held that none of the environmental agencies had filed a "proceeding in a court of law," and so no "suit" had been brought against the company. *Id.* Thus, the insurer had no duty to defend the insured.

13

The AMICO policies at issue here contain language regarding the duty to defend that is similar to that in *Lapham-Hickey*, *Zurich*, and *Fruit of the Loom*. As in those cases, the AMICO policies reserve the duty to defend in instances where a "suit" has been brought against SW. Just as the insureds in *Lapham-Hickey*, *Zurich*, and *Fruit of the Loom* had not been sued in a court of law, neither the EPA nor Lilly have filed a lawsuit against SW. In *Lapham-Hickey*, the Illinois Supreme Court rejected an approach that would weigh the coerciveness or gravity of the government's actions. Instead, the court chose to adopt a bright-line rule that an insurer's duty to defend would be triggered only by a lawsuit filed in a court of law if the insurance policy bore specific language regarding the insurer's duty to defend in the instance of a "suit." At this point, neither the EPA nor Lilly have filed suit in a court of law against SW. Since the AMICO general liability policies have explicitly stated that the duty to defend arises upon the filing of a suit, the underlying claims have not triggered AMICO's duty to defend.

SW attempts to distinguish itself from *Lapham-Hickey*, *Zurich*, and *Fruit of the Loom* by arguing that unlike those cases, it currently is under an Administrative Order issued by the EPA as opposed to a voluntary agreement. SW has been forced to act to investigate and remediate any contamination due to threats of lawsuit or substantial fines pursuant to the EPA's statutory authority. In *Fruit of the Loom*, however, the insured received similar written demands from a government environmental protection agency to investigate and remediate any contamination at their facilities. 284 Ill. App. 3d at 495, 672 N.E.2d at 285. The environmental agency's letter expressly stated that it was an enforcement action. *Id.*

Furthermore, SW's attempted distinction is meaningless because SW did initially negotiate a voluntary agreement with the EPA, but SW chose to unilaterally discontinue its performance of

14

the obligatory cleanup tasks under the agreement, with the understanding that in doing so the EPA would take more stringent action. The EPA then issued an Administrative Order that was very similar to the original voluntary agreement, which Order was subsequently renegotiated with SW. The EPA has the explicit power to issue administrative orders requiring private parties to clean up a site when imminent danger of harm exists. 42 U.S.C.A. § 9606. If the party refuses to comply with the order, then the EPA may seek compliance in federal court. *Kelley v. E.P.A.*, 15 F.3d 1100, 1103 (D.C. Cir. 1994). The EPA has not yet taken this case to federal court, and SW cannot avoid 42 U.S.C.A. § 9606 and *Lapham-Hickey* by discontinuing a voluntary agreement, and then renegotiating almost the identical agreement in the context of an administrative order. Therefore, the underlying EPA and Lilly claims have not triggered AMICO's duty to defend.

### 2. Duty to Indemnify

Under Illinois law, it is well-settled that where there is no duty to defend, there exists no duty to indemnify because the duty to defend is broader than the duty to indemnify. *See Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 397-98, 620 N.E.2d 1073, 1081 (1993); *Outboard Marine*, 154 Ill. 2d at 127, 607 N.E.2d at 1221; *Zurich*, 293 Ill. App. 3d at 909, 689 N.E.2d at 133. In *Zurich*, the insured argued that even if the insurer did not have a duty to defend, the insurer owed a duty to indemnify the expenses related to the contamination. *Id.* The insured identified the source of the duty to indemnify in the policy language "the Company will pay all sums which the insured shall become legally obligated to pay as damages because of . . . property damage." *Id.* The court rejected this argument, finding that because there was no duty to defend the company, there could be no duty to indemnify. *Id.*

As in *Zurich*, SW argues that even if AMICO has no duty to defend, AMICO must

15

nevertheless indemnify SW for the expense of its environmental cleanup because the parties drafted the policies to include indemnity for expenses that SW would become "legally obligated" to pay in the cleanup of contaminated areas. SW relies upon an Illinois appellate court decision, *Central Ill. Light Co. v. The Home Ins. Co.*, which held that the insurers were obligated to indemnify the company for cleanup and remediation costs even in the absence of filing a suit in a court of law, where an agreement between the company and the state environmental protection agency legally obligated the insured to comply with mandatory environmental regulations. 342 Ill. App. 3d 940, 959-60, 795 N.E.2d 412, 428-29 (3rd Dist. 2003). The insurance policies at issue in *Central Illinois*, however, can be distinguished both from the AMICO policies and those in *Lapham-Hickey*, *Zurich*, and *Fruit of the Loom* because the word "suit" did not appear at all in any part of the "insuring agreements" of the *Central Illinois* policies. 342 Ill. App. 3d at 951, 795 N.E.2d at 422.

Consequently, because AMICO does not owe a duty to defend SW in the EPA and Lilly claims, under Illinois law AMICO's duty to indemnify has not been triggered. The language in the policies at issue in the *Zurich* case reflects that of the pertinent clauses in the AMICO insurance agreement. The language in both provides a duty to defend in the instance that a "suit" is brought against the insurer and coverage for all sums that the insured "shall become legally obligated to pay." Despite this language, under *Zurich* and *Crum*, AMICO is not obligated to indemnify SW's environmental cleanup expenses in response to the underlying claims, since AMICO does not have a duty to defend SW in those claims.

### D. Motions to Strike

SW has filed two motions to strike: (1) a motion to strike AMICO's statement of undisputed facts and to deny AMICO's motion for summary judgment; and (2) a motion to strike

16

AMICO's LR 56.1(a)(3) reply to SW's LR 56.1 (b)(3)(B) statement of additional facts and portions of AMICO's reply brief in support of the motion for summary judgment. District courts have discretion to interpret and apply the local rules. *Tenner v. Zurek*, 168 F.3d 328, 331 (7th Cir. 1999). While the Court acknowledges that AMICO did not follow Local Rule 56.1 in setting out its statement of undisputed facts (by submitting a narrative statement rather than numbered paragraphs), the Court declines to grant SW's motion to strike. Although this Court does not condone the improper format utilized by AMICO, the content, while not the format, of AMICO's statement of undisputed facts satisfies the local rules. Furthermore, AMICO adequately cited to SW's own Counterclaim to show that certain facts were undisputed. Contrary to SW's claim, Local Rule 56.1 does not forbid a party from citing to an opposing party's pleading.

Likewise, SW is correct that portions of AMICO's LR 56.1(a)(3) reply to SW's statement of additional facts and portions of AMICO's reply brief in support of the motion for summary judgment violate the local rules. However, these errors do not affect the Court's ultimate decision in this case, and thus this motion to strike is likewise denied. AMICO did attempt to add additional facts in both its LR 56.1(a)(3) reply and its reply in support of its motion for summary judgment, and the Court has appropriately disregarded these additional facts. *See, e.g., Anderson v. Cornejo*, 225 F. Supp. 2d 834, 842 (N.D. Ill. 2002). The Court's ultimate ruling in this case is based on the relevant case law and on the unambiguous language of the AMICO insurance contracts issued to SW. The Court did not rely on any of the errors in AMICO's statement of undisputed facts, LR 56.1(a)(3) reply, and reply in support of its motion for summary judgment in making its decision. For these reasons, SW's motions to strike are denied.

## IV. CONCLUSION

For the reasons set forth above, AMICO's motion for summary judgment is GRANTED. The Court holds that AMICO is not obligated to defend and indemnify SW for expenses that SW has incurred and will continue to incur as a result of the environmental contamination at its plant on Drover Street in Indianapolis, Indiana, unless and until a complaint is filed against SW in a court of law regarding the environmental contamination. SW's motion to strike AMICO's statement of undisputed facts and to deny AMICO's motion for summary judgment is DENIED. SW's motion to strike AMICO's LR 56.1(a)(3) reply to SW's statement of additional facts and portions of AMICO's reply brief in support of the motion for summary judgment is DENIED.

IT IS SO ORDERED.

5/17/04
Dated

The Honorable William J. Hibbler
United States District Court